15 F.3d 1112
 304 U.S.App.D.C. 381, 62 USLW 2517
 NORTHWEST AIRLINES, INC., Petitioner,
v.
U.S. DEPARTMENT OF TRANSPORTATION, Respondent,
Delta Air Lines, Inc., Intervenor.
PAN AMERICAN WORLD AIRWAYS, INC., Petitioner,
v.
U.S. DEPARTMENT OF TRANSPORTATION, Respondent,
Delta Air Lines, Inc., Intervenor.
 Nos. 92-1251, 92-1254.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 7, 1993.
Decided Feb. 11, 1994.
Rehearing and Suggestion for Rehearing In Banc Denied April 12, 1994.
 
 [304 U.S.App.D.C. 384] Petition for Review of an Order of the U.S. Department of Transportation.
 Roy T. Englert, Jr., Washington, DC, argued the cause for petitioner Northwest Airlines, Inc. in No. 92-1251. With him on the joint briefs were Donald M. Falk, Clifford M. Sloan, Washington, DC, and Richard B. Hirst, St. Paul, MN.
 Richard D. Mathias, Washington, DC, argued the cause for petitioner Pan American World Airways, Inc. in No. 92-1254. With him on the joint briefs was Frank J. Costello, Washington, DC.
 Thomas L. Ray, Trial Attorney, U.S. Department of Transportation, Washington, DC, argued the cause for respondent. With him on the brief were Paul M. Geier, Assistant General Counsel, Peter J. Plocki, Trial Attorney, U.S. Department of Transportation, Robert B. Nicholson and Marion L. Jetton, Attorneys, U.S. Department of Justice, Washington, DC.
 Jonathan T. Cain, Washington, DC, argued the cause for intervenor. With him on the brief were Robert E. Cohn, Debra Osofsky, Washington, DC, and Don M. Adams, Atlanta, GA. Leslie A. Nicholson, Jr., Washington, DC, entered an appearance.
 Before MIKVA, Chief Judge, WALD and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Dissenting opinion filed by Circuit Judge GINSBURG.
 WALD, Circuit Judge:
 
 
 1
 Pan American World Airways, Inc. ("Pan Am") and Northwest Airlines, Inc. ("Northwest") seek review of the Department of Transportation's ("DOT" or "Department") decision to approve the transfer of Pan Am's Detroit-London route to Delta Air Lines, Inc. ("Delta"), pursuant to Sec. 401(h) of the Federal Aviation Act of 1958, as amended ("FAA" or "the Act"), 49 U.S.C.App. Sec. 1371(h) (Supp. III 1991). After careful examination of the statute and agency record, we find that the DOT's approval of the transfer is in accord with its statutory authority and the shortened time period provided for comments has been adequately justified. Accordingly, we affirm.
 
 I. BACKGROUND
 
 2
 This case arises out of the ongoing financial struggles of Pan Am. On July 27, 1991, while in Chapter Eleven bankruptcy in the Southern District of New York and in need of cash to finance an ultimately futile reorganization plan, Pan Am entered into an asset purchase agreement with Delta ("Asset Purchase Agreement" or "Agreement"). Pan Am agreed to sell most of its transatlantic routes and various other assets to Delta in exchange for $310 million (later increased to $416 million). Contingent upon the fulfillment of the terms of the Asset Purchase Agreement, Delta agreed to sponsor a plan of reorganization for Pan Am's Latin American operations. Because Sec. 401(h) of the FAA requires prior approval by the DOT of the transfer of a certificate of [304 U.S.App.D.C. 385] authority for an international route,[1] the Asset Purchase Agreement gave each party a termination right in the event that the DOT did not approve the transfer of the transatlantic routes by March 31, 1992. The Agreement also provided for a ten-day cure period following either party's notice of termination, which effectively extended the deadline for DOT approval of the transfers up to and beyond April 10, 1992.
 
 
 3
 To implement the Asset Purchase Agreement, Pan Am and Delta filed a joint application with the DOT seeking approval of the transfer of the transatlantic routes. On October 11, 1991, the DOT approved the transfers with the exception of the Detroit-London route, on which the DOT deferred action pending the receipt of additional information from the applicants. Subsequently, Pan Am and Delta amended the Asset Purchase Agreement to provide that Delta would immediately pay the agreed-upon price for all the assets, including the Detroit-London route, and that Delta would receive the Detroit-London route if and when the DOT approved the transfer. Two months later, with the Detroit-London transfer application ("Joint Transfer Application") still pending, Pan Am ceased all international and domestic air service. Consequently, the DOT granted Delta a six-month temporary exemption authority to service the Detroit-London route.
 
 
 4
 While awaiting the DOT's decision on the Joint Transfer Application, Pan Am signed a "back up" agreement granting Northwest the right to acquire the Detroit-London route for $9 million in the event that the Department denied the Joint Transfer Application. The bankruptcy court approved the Northwest agreement on the condition that it would take effect only if the DOT did not approve the transfer to Delta. In late January, 1992, Pan Am filed a complaint in the bankruptcy court asserting, inter alia, that Delta was in material breach of the Asset Purchase Agreement because Delta allegedly had failed to provide the agreed-upon financing for the reorganization of Pan Am's Latin American operations. The Asset Purchase Agreement allows for termination if one of the parties fails to cure a material breach within forty-five days of written notice thereof.
 
 
 5
 On March 31, 1992, the DOT issued an order tentatively approving the Detroit-London transfer from Pan Am to Delta. Order to Show Cause, Joint Application of Delta Air Lines, Inc. and Pan American World Airways, Inc., DOT Order 92-3-62 (Mar. 31, 1992) ("Show Cause Order"). The Show Cause Order gave the parties until April 6, 1992, to file their comments, with one day for replies. Two days later, the DOT denied Northwest's request for a ten-day, rather than a six-day, comment period. Northwest then unsuccessfully sought an emergency stay from this court. See Northwest Airlines, Inc. v. DOT, No. 92-1144 (D.C.Cir. Apr. 3, 1992). On April 6, Pan Am asked the bankruptcy court to confirm that Pan Am had the right to terminate the Asset Purchase Agreement. Delta countered by arguing that when Delta paid Pan Am the total purchase price for the transatlantic routes, Pan Am agreed to a modification of the Asset Purchase Agreement that eliminated Pan Am's termination right. The bankruptcy court postponed any decision as to whether Pan Am could terminate the Asset Purchase Agreement and told Pan Am to take whatever action it considered appropriate. On the same day, Pan Am both filed a notice with the DOT and sent Delta a written announcement stating its intent to terminate the Asset Purchase Agreement, thereby starting the clock for the ten-day cure period. The next day, Pan Am filed a formal motion to withdraw the Joint Transfer Application.
 
 
 6
 On April 14, 1992, despite the claims of Pan Am and Northwest (together, "petitioners") that Pan Am's attempt to withdraw its application divested the DOT of jurisdiction, the DOT issued a final order approving the transfer of the Detroit-London route to Delta, subject to certain conditions. Final Order, Joint Application of Delta Air Lines, Inc. and Pan American World Airways, Inc., DOT Order 92-4-33 (Apr. 14, 1992) [304 U.S.App.D.C. 386] ("Final Order"). In accordance with its desire to avoid resolving the contractual issues presented, the Department issued a new certificate of authority to Delta pending resolution of the contractual issues in the bankruptcy court, but provided Pan Am with a reversionary interest in the certificate should a court of competent jurisdiction issue a final and unappealable judgment holding that the amended Asset Purchase Agreement is no longer enforceable. In addition, the DOT left Pan Am's dormant certificate in place to enable Pan Am to effect the transfer to Northwest if the transfer to Delta was later nullified. At the time of oral argument, the bankruptcy court had not yet determined whether Delta had breached the Asset Purchase Agreement, or whether Pan Am had the right to terminate the Agreement.
 
 
 7
 In reaching its decision to approve the Pan Am-Delta transfer, the DOT followed Sec. 401(h)'s directive that it consider the public interest. One of the factors on which the DOT based its approval of the transfer was that Delta would provide single plane service from Cleveland to London via Detroit. Although Delta provided single plane service from Cleveland to London for eighteen months, low passenger demand caused it to cease direct service to and from Cleveland on June 1, 1993.
 
 
 8
 Petitioners' challenge to the Department's decision has two prongs.[2] First, they allege that the DOT unreasonably exceeded its statutory authority by approving the Joint Transfer Application over the objections of Pan Am. Second, they charge that the DOT failed to explain adequately its decision to provide only six days for comments on the Show Cause Order.
 
 II. DISCUSSION
 A. Approving the Joint Transfer Application
 
 9
 Section 401(h) of the FAA allows air carriers to transfer certificates of authority in exchange for consideration, provided they first obtain Department approval. See City of St. Louis v. DOT, 936 F.2d 1528, 1535 (8th Cir.1991). It states in pertinent part:
 
 
 10
 No certificate may be transferred unless such transfer is approved by the [DOT] as being consistent with the public interest.
 
 
 11
 49 U.S.C.App. Sec. 1371(h)(1) (emphasis added). As our dissenting colleague points out, the parties agree that under the plain meaning of Sec. 401(h), no transfer may be made without the initial consent of the transferring air carrier. The primary question here, however, is whether Sec. 401(h) precludes the DOT from denying one of the parties to a joint transfer application the opportunity to unilaterally [304 U.S.App.D.C. 387] withdraw the application at the last minute. When reviewing the DOT's interpretation of the FAA, we must follow the well-trodden path carved out in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Our first inquiry is whether, armed with the traditional tools of statutory construction, we can ascertain clear congressional intent on the precise issue before us. See id. at 842, 104 S.Ct. at 2781; see also K mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). If not, we defer to the agency's construction of the statute as long as it is reasonable or permissible. See Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782; Continental Air Lines, Inc. v. DOT, 843 F.2d 1444, 1449 (D.C.Cir.1988); Pan American World Airways, Inc. v. CAB, 684 F.2d 31, 37 (D.C.Cir.1982).
 
 
 12
 Petitioners rely on both the text of Sec. 401(h) and the purpose of the FAA as a whole to buttress their argument that the DOT erred in approving the Joint Transfer Application over the eleventh-hour objections of Pan Am. They point to the DOT's limited role under Sec. 401(h) of either approving or disapproving voluntary transfers and assert that the DOT cannot transfer a route certificate without the consent of both applicants. Additionally, petitioners claim that the Department's decision to approve the transfer contravenes one of the building blocks of the Act--reliance on competitive market forces. See 49 U.S.C.App. Sec. 1302(a)(4) (1988) (maximum reliance on competitive market forces and on actual and potential competition is in the public interest); see also City of St. Louis, 936 F.2d at 1537 (Sec. 401(h) is designed to facilitate a "market ... for the governmental permissions that a carrier must obtain to carry people between this country and another"). According to petitioners, the DOT's approval of the Joint Transfer Application frustrated market principles by interfering with Pan Am's contractual right to terminate the Asset Purchase Agreement.
 
 
 13
 We find that petitioners' evidence of congressional intent fails to satisfy the first prong of Chevron. Although the statutory language of Sec. 401(h) contemplates a consensual transfer, it is silent on the precise question presented by this case: whether the DOT is precluded from approving a transfer application when the potential transferor seeks to withdraw the application at the last minute, over the objections of the potential transferee, and after the DOT has tentatively approved the transfer. Nor was the DOT's decision to grant the certificate to Delta subject to a reversionary interest in favor of Pan Am clearly foreclosed by the Act's encouragement of adherence to free market principles. In fact, the DOT was motivated by a desire to preserve the contractual rights of all parties and thus protect the efficient operation of the marketplace. See Final Order at 2. The DOT feared that by allowing Pan Am to withdraw the Joint Transfer Application, it might interfere with market forces by automatically extinguishing Delta's rights under the Asset Purchase Agreement. If the DOT did not approve the Joint Transfer Application by March 31, 1992, Pan Am had the right to give Delta notice of its intent to terminate the Agreement at any time. Upon such notice, the Agreement would automatically terminate unless the DOT approved the Joint Transfer Application within the next ten days. Moreover, Pan Am's market-oriented behavior was already severely limited by its status as a Chapter Eleven debtor. Pan Am lacked an unfettered right to transfer the Detroit-London certificate; any transfer was subject to the approval of the bankruptcy court. At the time of the Department's decision, the bankruptcy court had expressly declined to make any determination as to whether Pan Am could transfer the Detroit-London certificate to Northwest. Because Pan Am is hardly an unfettered free market participant in the present action, the reliance of both petitioners and the dissent on free market principles is somewhat off-target.
 
 
 14
 In their effort to draw attention to the Act's interest in cultivating reliance on market principles, petitioners overlook one of the other public interest factors emphasized by the Act--the need to develop "a sound regulatory environment ... in which decisions are reached promptly...." 49 U.S.C.App. Sec. 1302(a)(5) (1988). Allowing [304 U.S.App.D.C. 388] one applicant to withdraw its transfer application at any point in the DOT's review process would hamper the public's interest in administrative efficiency, especially when withdrawal is attempted during the tail-end of agency decisionmaking. Pan Am strained the administrative process by attempting to call off the game in the bottom of the ninth inning, and the DOT acted appropriately in considering the effect of Pan Am's actions on the efficient operation of the Department. In sum, we cannot discern in Sec. 401(h) a specific congressional intent to preclude the DOT from granting a transfer application over the minute-to-midnight objections of one of the applicants, nor can we conclude that the Final Order contravened the purposes of the FAA.
 
 
 15
 Petitioners also urge us to find that the DOT exceeded its statutory authority by modifying Pan Am's existing certificate without complying with the procedural requirements of Sec. 401(g), which relates to the alteration or modification of existing certificates, and by creating a new certificate without complying with the substantive and procedural requirements of Sec. 401(d), which governs the issuance of new certificates. See 49 U.S.C.App. Secs. 1371(d) & (g) (1988). We reject this overly formalistic characterization of the transaction prescribed by the Final Order. The DOT's decision to leave Pan Am with a dormant certificate which can be reactivated if a court of competent jurisdiction rules in Pan Am's favor is not equivalent to an "alteration, amendment, or modification" of the certificate within the meaning of the Act. See 49 U.S.C.App. Sec. 1371(g) (pursuant to certain procedures, Department may alter, amend, modify, or suspend any certificate if public convenience and necessity so require). Nor is it unusual for the DOT to issue a new certificate to a transferee instead of physically altering the old one. See, e.g., Joint Application of Delta Airlines, Inc. and Pan American World Airways, Inc., DOT Order No. 91-10-33 at 6 (Oct. 11, 1991). Finally, we do not find merit in the claim that the DOT lacked the authority to subject a certificate to a reversionary interest. We have previously upheld the imposition of a condition on an air carrier's permit that restricted the carrier's future operating authority. See Dan-Air Servs., Ltd. v. CAB, 475 F.2d 408 (D.C.Cir.1973) (affirming implementation of condition requiring foreign air carriers to file for advance approval of all passenger charter flights approximately two years after permits were issued); see also Fidelity Television, Inc. v. FCC, 515 F.2d 684, 703 n. 45 (D.C.Cir.) (affirming FCC grant of T.V. license conditioned on outcome of other proceedings), cert. denied, --- U.S. ----, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975).
 
 
 16
 The ambiguous intent of Congress regarding the precise issue before us propels us into the second phase of the Chevron inquiry: whether the DOT's interpretation of its statutory authority under Sec. 401(h) was reasonable. Acknowledging that the resolution of contractual disputes is beyond its competence, the DOT attempted to structure the transfer so as to leave the determination of the contractual issues to the bankruptcy court. If the bankruptcy court finds for Pan Am, Pan Am's certificate will be reactivated and Pan Am can transfer it to Northwest (after receiving DOT approval). If, on the other hand, Delta is found to have complied with the Asset Purchase Agreement, its certificate will continue in force as the Agreement originally provided. It is true that if the bankruptcy court eventually determines that Delta was in material breach of the Asset Purchase Agreement, the Department's decision will have interfered with Pan Am's right to transfer the Detroit-London route to Northwest in the interim. However, we believe the DOT's decision still qualifies as a reasonable attempt to preserve the final say on the contractual issues for the bankruptcy court. Our task is to enforce a standard of agency reasonableness, not perfection. See Pan American World Airways, Inc. v. CAB, 684 F.2d 31, 37 (D.C.Cir.1982); see also Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (to qualify as arbitrary and capricious, agency decision must be "so implausible that it could not be ascribed to a difference in view").
 
 
 17
 The DOT's determination to go ahead with a decision on the merits of the [304 U.S.App.D.C. 389] Joint Transfer Application was also reasonable in light of the public interest in conservation of administrative resources. A brief analysis of prior Civil Aeronautics Board ("CAB")[3] and DOT decisions under other sections of the FAA demonstrates that the importance of administrative efficiency has been a longstanding justification for denying last-minute withdrawals from administrative proceedings. In Michigan Peninsula Airways Fitness Investigation, CAB Order 84-8-92 at 2 (Aug. 22, 1984), for example, the CAB denied an applicant's motion to withdraw a Sec. 401(d) certificate application because allowing an absolute right to withdraw would permit abuse of agency procedures. Although one of the CAB's justifications for refusing to allow the withdrawal was that the applicant was attempting to avoid the res judicata effect of an adverse decision, the CAB also explained that because "the Act requires that these cases be handled without undue delay.... [g]iven the late date and the status of the proceedings, it is time for a pronouncement on [the applicant's] fitness." Id.; see also Dominion Intercontinental Airlines, Inc. Fitness Investigation, DOT Order 86-1-75 at 2 (Jan. 31, 1986) (request to withdraw certificate application to avoid res judicata effect of an adverse decision denied because such requests are typically disfavored when received only after a case has been extensively litigated); Aries Air Cargo Int'l, Inc. and Overseas Nat'l Airways, Inc., CAB Order 73-4-104, at 3 (April 25, 1973) (CAB considered joint application filed by two cargo airlines seeking approval of lease agreement under Sec. 408(b) of FAA even though one party sought to terminate lease agreement and withdraw application, thereby "leaving the apparent contractual dispute to the appropriate forum").[4]
 
 
 18
 Petitioners criticize the Final Order for its failure to discuss Pan Am's argument that even if it was contractually bound to transfer the route to Delta, it had a right to undertake an "efficient breach"[5] of the Asset Purchase Agreement. We are, of course, barred by statute from considering this argument if, as DOT argues, petitioners [304 U.S.App.D.C. 390] failed to articulate it before the Department. See 49 U.S.C. Sec. 1486(e) (1988) (court may not review objection to order of the DOT unless the objection was raised with the Department); see also Horizon Air Indus., Inc. v. DOT, 850 F.2d 775, 780 (D.C.Cir.1988); Continental Air Lines v. DOT, 843 F.2d 1444, 1455 (D.C.Cir.1988). Petitioners maintain, however, that Pan Am did raise the "efficient breach" argument below. As evidence, they supply us with a single sentence extracted from one pleading filed by Pan Am with the DOT regarding the termination of the Asset Purchase Agreement: "The simple fact is that Pan Am has exercised its right to interpret its contractual rights and obligations at the risk of being found wrong and subject to damages or other remedies in a court of proper jurisdiction, a risk which Pan Am believes is minimal." Reply of Pan American World Airways, Inc. to Responses of Delta Air Lines, Inc., Docket No. 47675, reprinted in Joint Appendix ("J.A.") at 293. The most reasonable reading of Pan Am's statement in the context of the other pleadings filed with the Department, however, is that Pan Am was referring to its right to terminate the Asset Purchase Agreement on the basis of Delta's alleged breach, and not to any independent right to breach the Agreement. As the DOT argues, had Pan Am been referring to an independent right to breach the Agreement, it would not have spoken of a risk of being subject to damages or other remedies; Pan Am definitely would have had to make some restitution to Delta as compensation for breaching the Agreement. Accordingly, we agree with the DOT that petitioners failed to raise the "efficient breach" argument before the Department and we therefore decline to reach it here.
 
 
 19
 Finally, petitioners rely on the Department's order to show cause in Joint Applications of American Airlines, Inc. and Eastern Airlines, Inc., DOT Order 91-8-1 (Aug. 2, 1991) to support the proposition that the Final Order arbitrarily and capriciously departed from agency precedent. They interpret Eastern as holding that a carrier's consent to a transfer is a necessary prerequisite to the Department's maintenance of jurisdiction over a transfer application. In the Eastern case, Eastern, like Pan Am, was in bankruptcy. Eastern had filed two different joint applications for the transfer of the same route, one with American Airlines, Inc. ("American") and the other with Delta. The Department noted that normally it would proceed to consider both applications. Id. at 7. However, since the bankruptcy court had approved only the Eastern-Delta transfer agreement, and because Eastern preferred the Delta transfer, the Department thought it pointless to consider the Eastern-American transfer agreement and announced in the order to show cause its intention to dismiss the Eastern-American application as moot. Id.; see also Final Order, Joint Applications of American Airlines, Inc. and Eastern Airlines, Inc., DOT Order 91-10-35 (Oct. 15, 1991) (dismissing Eastern-American application).
 
 
 20
 An agency should not gloss over or swerve away from prior precedent without discussion. See Japan Air Lines Co. v. Dole, 801 F.2d 483, 486 (D.C.Cir.1986) (citing Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)), cert. denied, 480 U.S. 917, 107 S.Ct. 1372, 94 L.Ed.2d 688 (1987). Far from "glossing over" its departure from the Eastern decision, the DOT specifically tackled the task of distinguishing Eastern. The Department explained that it granted Eastern's request to withdraw the Eastern-American transfer application because the parties had agreed that Eastern could choose between the two transfer agreements. It was preordained that if Eastern chose the Eastern-Delta transfer agreement, it would terminate the Eastern-American agreement and, if the termination occurred before the Department had approved the Eastern-American transfer application, it would be withdrawn. In this case, by contrast, the Department was concerned that Pan Am might be bound by the terms of the Asset Purchase Agreement to transfer the Detroit-London route to Delta and thus could not choose to withdraw[304 U.S.App.D.C. 391] the Joint Transfer Application. Final Order at 12. Whereas none of the parties involved objected to the withdrawal of the Eastern-American transfer application, Delta vociferously argued that Pan Am could not withdraw the Joint Transfer Application. In sum, the Department found that the possibility that Pan Am lacked the legal right to withdraw the Joint Transfer Application justified its departure from the course taken in Eastern.
 
 
 21
 Though terse, we find the Department's distinction adequate. To begin with, the Department never suggested that it lacked jurisdiction to consider the Eastern-American application. There simply was no reason for it to do so. And unlike the Eastern-American agreement which already had been rejected by the bankruptcy court, Pan Am's agreement with Delta was still very much alive. Therefore, the petitioners cannot prevail on their claim that the Final Order represents an arbitrary and capricious departure from DOT precedent. After careful consideration of petitioners' objections, we find that the DOT's decision to approve the transfer over the objections of Pan Am was based on a reasonable interpretation of the FAA.
 
 B. Adequacy of Comment Period
 
 22
 Petitioners' final argument is that the Department's provision of six days for comment on the Show Cause Order and one day for replies represented an unjustified deviation from its usual practice of allowing ten to fourteen response days. The DOT denies that it has ever adopted a strict policy of allowing ten days to respond to orders to show cause. When issuing this Show Cause Order, the Department set out three reasons for limiting the comment period to six days: (1) the already voluminous record; (2) the absence of any need to consider the validity of the agreement between Delta and Pan Am; and (3) the urgency in consummating the Pan Am-Delta transfer before the expiration of the Asset Purchase Agreement.[6] Petitioners do not accept the reasonableness of any of these three explanations.
 
 
 23
 The FAA specifically authorizes the DOT to "conduct [its] proceedings in such manner as will be conducive to the proper dispatch of business and to the ends of justice." 49 U.S.C.App. Sec. 1481 (1988). Neither the statute nor the regulations require the DOT to provide any comment period after the issuance of an order to show cause. In reviewing petitioners' claim, therefore, we must accord substantial deference to the DOT. See Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc., 435 U.S. 519, 543-44, 98 S.Ct. 1197, 1211-12, 55 L.Ed.2d 460 (1978); see also Louisiana Ass'n of Indep. Producers v. FERC, 958 F.2d 1101, 1115 (D.C.Cir.1992) ("[O]nce due process is satisfied the amount and form of any additional process an agency wishes to provide is left almost entirely to its discretion."). The Department persuasively argues that the six-day comment period was reasonable. First, the parties had filed extensive rounds of pleadings regarding the Joint Transfer Application during the previous seven months. Second, contrary to petitioners' contention that they lacked adequate time to prepare arguments for submission to the Department regarding the relevance of Pan Am's contractual claims, there were two months between the filing of Pan Am's material breach claim against Delta and the issuance of the Show Cause Order. We note in this regard that Pan Am did not attempt to terminate the Asset Purchase Agreement and withdraw the Joint Transfer Application until after the DOT established the six-day comment period. Third, it was reasonable for the Department to attempt to issue a final order on the Joint Transfer Application before the contractual deadline for DOT approval. Finally, and most important, petitioners have failed to show that they were prejudiced by the length of the comment period. They were able to submit a fifty-seven page response and a motion for reconsideration before the DOT, and a motion for stay pending judicial review in this court. Thus we conclude that the provision of six days for comments and one day for replies was not unreasonable.
 
 III. CONCLUSION
 
 24
 Section 401(h) of the FAA does not address the precise question of whether the [304 U.S.App.D.C. 392] DOT is precluded from granting a joint transfer application when one of the applicants withdraws its consent to the transfer at the last minute. In light of the FAA's emphasis on the importance of the conservation of administrative resources to the public interest, the Department reasonably concluded that it could approve a Sec. 401(h) transfer application over the eleventh-hour objections of one of the parties. The Department presented a coherent rationale for both its decision to transfer the Detroit-London certificate to Delta with a reversionary interest in favor of Pan Am and its provision of only six days for comments on the Show Cause Order. Therefore, we deny the petition for review.
 
 
 25
 It is so ordered.
 
 GINSBURG, Circuit Judge, dissenting:
 
 26
 This case poses the question whether an air carrier's continuing consent is a prerequisite to DOT approval, pursuant to Sec. 401(h) of the Federal Aviation Act, of an application to transfer the carrier's route certificate to another airline. Pan Am and Northwest Airlines argue that it is; the DOT and Delta argue that because Pan Am and Delta once applied for the transfer the DOT can effect it regardless of Pan Am's having repudiated its deal with Delta while the application was pending before the agency. Because the DOT's interpretation of Sec. 401(h) is unreasonable--both textually and in light of the Congress's purpose to rely upon market forces in the airline industry--I would reverse the agency's decision to transfer Pan Am's Detroit-London route certificate to Delta over Pan Am's objection.
 
 
 27
 Section 401(h) is written in terms of the transferor carrier's need for "approval": "No certificate may be transferred [i.e., by the carrier] unless such transfer is approved by the [DOT] as being consistent with the public interest." 49 U.S.C.App. Sec. 1371(h) (Supp. III 1991). This clearly implies that the transferring air carrier must itself seek to transfer the route certificate. Indeed, every party to this proceeding agrees that the plain meaning of the statute requires the consent of the air carrier to the transfer of its route certificate. No other meaning makes sense, and in fact the DOT evaluates a transfer only upon the application of the carrier holding the certificate.
 
 
 28
 That consent is required at some point, therefore, is not at issue; whether a carrier can withdraw its consent before the agency has approved its application is. Neither the text of the statute nor its legislative history indicates that the Congress focused specifically upon that issue--probably because the answer is too obvious to think that it would ever be controversial. As a result, we are on firmer ground considering this question, as the Court does, pursuant to the second step of Chevron.
 
 
 29
 Under Chevron step II we defer to an agency's statutory interpretation only if it is reasonable in light of the language and the purpose of the statute. Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). See also Continental Air Lines, Inc. v. DOT, 843 F.2d 1444, 1449 (D.C.Cir.1988). The DOT's interpretation of the approval requirement, and of the concept of consent necessarily entailed therein, is unreasonable on both counts. For the terms of Sec. 401(h), the limited authority it gives the agency to review a transfer application, and the market principles animating the statute all require a common sense, not a contrived, understanding of the consent necessitated by Sec. 401(h).
 
 
 30
 First, nothing in the text of Sec. 401(h) suggests any exception to the requirement that the transferor consent to the transfer that the agency would "approve." The one sentence that is Sec. 401(h) refers only to the ground upon which the DOT can deny a transfer application; there is no ground in Sec. 401(h) upon which it can require a carrier to transfer its route certificate. That is the work of Sec. 401(g), 49 U.S.C.App. Sec. 1371(g) ("The Board ... upon its own initiative ... may alter, amend, modify, or suspend any such certificate").
 
 
 31
 Second, the DOT takes an appropriately limited view of its authority to disapprove a transfer application: "[It will] generally approve route transfers unless they conflict with important international aviation policy objectives or are otherwise inconsistent with the public interest." Joint Application of Delta Air Lines, Inc. and Pan American [304 U.S.App.D.C. 393] World Airways, Inc., Order 92-4-33 (DOT Apr. 14, 1992); accord Joint Application of Delta Air Lines, Inc. and Pan American World Airways, Inc., Order 91-10-33 (DOT Oct. 11, 1991); Joint Application of Delta Air Lines, Inc. and Eastern Air Lines, Inc., Order 91-10-34 (DOT Sept. 24, 1991); Joint Application of American Airlines, Inc. and Eastern Air Lines, Inc., Order 91-8-1 (DOT Aug. 2, 1991). The DOT has repeatedly emphasized its limited role, reminding air carriers that since deregulation the agency does not review transfer applications in order to select the "best" air carrier for a particular route. See, e.g., Joint Application of American Airlines, Inc. and Eastern Air Lines, Inc., Order 91-8-1 (DOT Aug. 2, 1991) ("The issue is not whether United might provide 'better' service in these markets, as it contends it will, but whether the proposed transfer of Eastern's authority to USAir is consistent with the public interest"). It is inconsistent with the DOT's limited and essentially passive role, in which it applies permissive criteria to transactions initiated by private parties, for that agency to insist upon completion of a transfer to which the transferor objects.
 
 
 32
 Moreover, until now the agency has not regarded the disputed contractual obligations of potential transfer parties as part of its "public interest" inquiry under Sec. 401(h). See, e.g., Joint Application of Delta Air Lines, Inc. and Pan American World Airways, Inc., Order 91-10-33 (DOT Oct. 11, 1991) (refusing to consider underlying contract obligations as part of the public interest inquiry because contract rights are to be adjudicated in bankruptcy court). In fact, the agency's normal procedure is to evaluate every transfer application filed, even if duplicative, for consistency with the public interest and then to let the transferor carrier determine the final disposition of its route certificate. See Joint Application of American Airlines, Inc. and Eastern Air Lines, Inc., Order 91-8-1 (DOT Aug. 2, 1991) ("Having tentatively concluded that [one transfer application] is consistent with the public interest, we would normally proceed to evaluate the merits of the [second application].... [T]he seller would then be free to choose from among [sic] the two approved [applications]").
 
 
 33
 Finally, the market principles underlying the statute preclude the strained textual interpretation by which the DOT could "approve" a transfer to which the transferor does not consent. In past decisions the DOT has clearly acknowledged, indeed proclaimed, that Sec. 401(h) must be interpreted and applied to facilitate a free market in air carrier routes. Thus, when determining whether an application is consistent with the public interest, the DOT recognizes that it must "begin from the proposition that each [transfer] application is jointly made by transferring and acquiring carriers responding to economic influences in the aviation marketplace." Joint Application of American Airlines, Inc. and Eastern Air Lines, Inc., Order 91-8-1 (DOT Aug. 2, 1991).
 
 
 34
 Obviously, that proposition is not tenable when the transferring carrier no longer supports the application in which it had once joined. A marketplace is not static; the great virtue of the market is its ability to respond to changing conditions. Far from promoting the market in route certificates, however, the agency's interpretation of the statute to preclude a carrier from withdrawing its transfer application--quite apart from any contractual obligation to which the carrier may have agreed--frustrates the ability of market participants to respond to changed circumstances. As far as the DOT is concerned, therefore, at least until now the carrier's final choice of a transferee has been independent of, and irrelevant to, the transfer application process (provided of course that each potential transferor meets the public interest test).
 
 
 35
 Even if the DOT were not required to permit Pan Am to withdraw its application, the agency's new-found concern with itself preserving the contract rights of the parties--what might be called amateur night at the common law, complete with 'reversionary interests'--is strikingly inconsistent with its own prior assertion that it performs its approval function under Sec. 401(h) without regard to the parties' contractual commitments; to quote the DOT, the bankruptcy court is "fully capable of protecting" the parties' contract rights. Joint Application of Delta Air Lines, Inc. and Pan American World Airways, Inc., Order 91-10-33 (DOT [304 U.S.App.D.C. 394] Oct. 11, 1991). Indeed, the bankruptcy court has exclusive jurisdiction to determine a bankrupt carrier's contractual liability. See 11 U.S.C. Sec. 502(b). If the DOT were truly agnostic with respect to Pan Am's contract obligations, as it even now claims it was, it would at most have simply determined whether either of the transfer applications to which Pan Am consented is inconsistent with the public interest and if not left the final decision--and its consequences as a matter of contract law--to Pan Am and the bankruptcy court.
 
 
 36
 The court today upholds the DOT's shenanigans as "reasonable in light of the public interest in conservation of administrative resources," ct. op. at 1119--an interest esteemed by all, I am sure, but not one served by the agency's decision. Hence the series of irrelevant afterthoughts to be found in the court's footnote 4 at p. 1120. The court first tries to draw sustenance from the statutory injunction for DOT to make decisions "promptly," as though it were authority for the agency to make decisions willy-nilly, even when they are no longer wanted. Nor is "administrative efficiency" served by insisting upon approving an application after one of the applicants has abandoned it; on the contrary, respecting the applicant's withdrawal would avoid the consumption of further administrative resources, whereas forging ahead consumes additional resources but does nothing to retrieve resources already sunk in the approval process. (As for the possibility of "encourag[ing] future applicants to abuse the administrative process by consuming the Department's resources and then dropping their applications at the final stage of the game," I am simply at a loss to make any sense whatsoever of the court's concern.) Finally, the court elevates to an importance equal to administrative efficiency the completely irrelevant "fact that Pan Am is in bankruptcy"; but there is no reason--at least the court offers none--either to think that the bankruptcy court will not try to maximize the value of Pan Am's assets or that the carrier's management was not trying to do that when it repudiated its deal with Delta.
 
 
 37
 Nor do the three agency orders cited by the Court at page 1120 provide any justification for allowing "the public interest in conservation of administrative resources" to trump the Congress's decision to rely upon the market to allocate air routes. The market principle at the core of Sec. 401(h) dictates that the DOT limit its involvement in route certificate transfers in a way that does not apply to other DOT functions under the statute. Not surprisingly, therefore, the agency orders cited by the court all involved actions under other provisions of the Federal Aviation Act. Indeed, two of those DOT decisions concerned the fitness of an applicant to provide air service. See Michigan Peninsula Airways Fitness Investigation, Order 84-8-92 (CAB Aug. 22, 1984) (questioning applicant's safety); Dominion Intercontinental Airlines, Inc. Fitness Investigation, Order 86-1-75 (DOT Jan. 31, 1986) (questioning applicant's managerial competence). In each case the DOT understandably refused to allow the applicant to withdraw, after the record had been developed and the issues fully argued, "in order to avoid the res judicata effect of an adverse decision." Dominion Intercontinental Airlines, Inc. Fitness Investigation, above, at 2 n. 1; see also Michigan Peninsula Airways Fitness Investigation, above, at 2. In contrast, an air carrier that withdraws a Sec. 401(h) transfer application does nothing to frustrate the DOT's administration of the Act. It is only trying to sell its asset to a different buyer at a better price, which is how a well-functioning market in route authority efficiently allocates resources, and just what the Congress had in mind.
 
 
 38
 The third case, Aries Air Cargo Int'l, Inc. and Overseas Nat'l Airways, Inc., CAB Order 73-4-104 (April 25, 1973), involved DOT review of a lease agreement under Sec. 408, which authorizes the agency to condition or modify a proposed transaction that would otherwise "lessen competition, ... tend to create a monopoly, or ... be in restraint of trade." 49 U.S.C.App. Sec. 1378(b)(1). It is not entirely clear why, when one of the parties claimed to have terminated the lease, the DOT went on to opine that the lease was not anticompetitive; it made no mention of administrative efficiency. In any event, the agency did not go on to require the parties to perform under the lease agreement, so its decision is hardly analogous to the one presently before us.
 
 
 39
 For the foregoing reasons, I find the DOT's interpretation of Sec. 401(h) to be unreasonable, [304 U.S.App.D.C. 395] and I would reverse the agency's decision to transfer Pan Am's Detroit-London route certificate to Delta. I respectfully dissent.
 
 
 
 [1]
 An air carrier may only service an international route if it possesses a certificate of authority for that route. See 49 U.S.C.App. Sec. 1371(a) (1988); cf. City of St. Louis v. DOT, 936 F.2d 1528, 1535 (8th Cir.1991) (certificate of authority for domestic service valid on all domestic routes)
 
 
 [2]
 Petitioners contend that even if the DOT's decision is found to be a valid and reasonable exercise of its authority, the court should still remand the Final Order to take account of Delta's cancellation of its single plane Cleveland-Detroit-London service. We disagree. To justify remand in the face of agency opposition, a change in circumstances must be more than a material change; it must be a "change in 'core' circumstances, going to 'the very heart of the case.' " Cleveland Television Corp. v. FCC, 732 F.2d 962, 973 n. 13 (D.C.Cir.1984) (quoting Greater Boston Television Corp. v. FCC, 463 F.2d 268, 283 (D.C.Cir.1971), cert. denied sub nom. WHDH, Inc. v. FCC, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972)); see also Oklahoma Natural Gas Co. v. FERC, 940 F.2d 699, 704 (D.C.Cir.1991). Delta's cancellation of the direct service from Cleveland to London after eighteen months is not a change in circumstances going to the "very heart" of the Department's decision
 The DOT generally grants transfer applications "unless they conflict with important international aviation policy objectives or are otherwise inconsistent with the public interest." Show Cause Order at 7. Unlike the issuance of a new route certificate, the transfer proceeding is not comparative--the Department will not disapprove a transfer merely because another carrier might provide better service than the transferee. Although Delta's provision of behind-gateway service to Cleveland was a "critical point in favor of approval" of the Joint Transfer Application, Final Order at 23, the Department also relied on other factors, for example: (1) approval would not conflict with important international aviation policy objectives; (2) Delta would offer more service over the Detroit-London market than Pan Am; and (3) Delta would provide increased competition with Northwest and British Airways. These factors remain valid and continue to support the Department's decision that Delta would provide satisfactory service to the public on the Detroit-London route. Moreover, nothing in the statute, regulations, or Final Order bars Delta from replacing its single plane service between Cleveland and London with connecting service. Therefore, petitioners have not sustained the heavy burden of showing a change in "core" circumstances necessitating a remand.
 
 
 [3]
 The powers and duties of the CAB were transferred to the DOT as of January 1, 1985. See 49 U.S.C.App. Sec. 1551(b) (1988)
 
 
 [4]
 We emphasize that our reliance on the public interest in administrative efficiency stems in part from the FAA itself, and not merely from these three agency orders. One of the public interest factors emphasized by the Act is the need to develop "a sound regulatory environment ... in which decisions are reached promptly...." 49 U.S.C.App. Sec. 1302(a)(5) (1988). Attempting to withdraw a Sec. 401(h) transfer application at the last minute clearly frustrates this purpose of the Act
 Our dissenting colleague suggests that by upholding the DOT's decision to grant the Joint Transfer Application, we are erroneously allowing the public's interest in administrative efficiency to "trump" the FAA's emphasis on market forces. Diss. op. at 1125. But our colleague struthiously ignores the unique facts of this case, which are clearly central to our holding--Pan Am waited to withdraw the Joint Transfer Application until the eleventh hour, when the Department had already granted conditional approval of the transfer, and Delta, the potential transferee, strenuously objected to the withdrawal. This was not a case in which the Department approved a transfer against the wishes of both applicants; Delta's strong support of the application is demonstrated by its appearance in this litigation as an intervenor on the Department's behalf. A last-minute withdrawal, especially one that comes after the Department has evaluated the application thoroughly enough to grant its conditional approval, frustrates the interest in conservation of administrative resources to a greater degree than an earlier withdrawal; allowing such a withdrawal would encourage future applicants to abuse the administrative process by consuming the Department's resources and then dropping their applications at the final stage of the game. Our holding is limited to the particular facts of this case, and we express no opinion as to whether we would find reasonable a DOT decision to deny an earlier request to withdraw. Equally important to our holding is the fact that Pan Am is in bankruptcy, which undermines the dissent's emphasis on market principles. In the end, whether the DOT approved both the Pan Am-Delta and the Pan Am-Northwest transfers and then let Pan Am choose between them (as the dissent suggests it should have, see diss. op. at 1124-25), or whether the DOT effected the Delta transfer subject to a reversionary interest for Pan Am (as the DOT actually did), it is the bankruptcy court, and not the market, that will have the final say as to which airline receives the route.
 
 
 [5]
 "Efficient breach" refers to the principle that a breaching party has the option of paying damages rather than performing its contractual obligations where damages are an adequate substitute for specific performance. See generally RESTATEMENT (SECOND) OF CONTRACTS ch. 16 intro. note at 100 (1981)
 
 
 [6]
 If the transfer of the Detroit-London route did not obtain DOT approval by March 31, 1992, the terms of the Asset Purchase Agreement allowed either of the parties to terminate the Agreement upon ten days notification